## JANE KAVANAGH v. THE GOLDEN RULE.[1]

July 9, 1948.

No. 34,627.

*Randall, Smith, Blomquist & Krawetz,* for appellant.
*Oppenheimer, Hodgson, Brown, Donnelly & Baer,* for respondent.

MAGNEY, JUSTICE.

In a suit to recover a bonus which plaintiff claims defendant had agreed to pay her, plaintiff had a verdict. The court granted defendant judgment notwithstanding the verdict, and plaintiff appeals.

Defendant is the owner of a large department store in St. Paul. Plaintiff had been employed by it as a buyer and department manager of its dress departments since 1937. She resigned March 18, 1944. During 1942 and 1943 and until her services terminated, plaintiff's regular salary was $275 a month. In May 1943, a written bonus arrangement, satisfactory to plaintiff, was handed to plaintiff by Mr. Philip J. Troy, the president of defendant. It provided that plaintiff would be paid a bonus of two percent of the dollar increase in sales over a certain fixed quota for her departments and two percent of

[1]Reported in 33 N. W. (2d) 697.

the dollar increase in controllable net profit over the previous year. The bonus would be paid only if a minimum gross margin of profit plus discounts specified in the bonus agreement was equaled or exceeded. It seems unnecessary to define what is meant by "controllable net profit."

The spring season of 1943 in plaintiff's departments was very successful. Sales exceeded the proportionate quota, as also did the controllable operating profit. The prescribed gross margin plus discount reached 34.9 percent over the prescribed minimum of 33.96 percent. Markdowns and shrinkages were low compared with the spring of 1942.

Plaintiff's departments were housed on the third floor of the building. Remodeling of that part of the floor where these departments were located commenced the first part of July 1943 while plaintiff was on her vacation. Remodeling of a progressive store is not an abnormal condition. Eventually it will reach every department. This was the first remodeling on that floor in seven years. The remodeling necessitated the moving of the stock of dresses from time to time, displaying part of it on temporary racks, and the storing of excess stock wherever space might be found. The dust, dirt, and debris incidental to remodeling were of course present. Plaintiff claims that because of the work going on the stock was soiled and dresses disappeared; that the New York buying office of defendant was sending in more merchandise than had been ordered; and that as a result the dresses that were soiled and damaged were marked down in price in order to move them and that the merchandise received in excess of requisitions could be sold only by taking severe markdowns and putting it out at clearance sales. She claims that this all resulted in affecting her bonus possibilities. She states that in the middle of August 1943 she spoke to Mr. Troy and pointed out to him the situation in her departments and that it was hopeless to try to make the gross margin requirements of her bonus contract. She stated that up to the time of remodeling there was every indication that she would get a very substantial bonus. Troy told her, according to her testimony, that he was aware of the situation

brought about by the remodeling and also that merchandise was being sent from New York in excess of requisitions. He said that he was interested primarily in increasing the volume of these departments; that he was not concerned at that time with the profit picture. Plaintiff stated that she had no objection to volume, but that it was ruining her chances of making a bonus, because she could not make the gross margin requirements. Troy repeated that he was interested primarily in increasing the volume of these departments, and he told plaintiff to forget about her gross margin requirements and that the bonus would be based on the increase in volume. Plaintiff said that this arrangement would be satisfactory to her. She testified: "Mr. Troy then said, 'Forget about your gross margin requirements, your bonus will be based on the increase in volume,' and he pounded on the table and said, 'I want volume.' I said that was agreeable to me." Troy positively denies that any such conversation took place as related by plaintiff. The remodeling of the dress departments continued until the early part of 1944, according to plaintiff. In the fall of 1943, markdowns and shrinkage had risen materially.

On March 18, 1944, plaintiff voluntarily resigned from her position. On that day she asked Troy when the bonuses would be paid. He told her that the figures were not complete, but that he had some estimates and that plaintiff's proposed bonus would be $400 plus. She was disappointed. She said those figures could not be right, because she had a fairly accurate idea as to how much it should be, and her estimate was about $1,200. During the years she had been employed by defendant as department manager she had succeeded only two times in making her bonus, the highest amount being $368.78. She received no bonus for 1942. At this conference plaintiff asked for and received two weeks' advance pay.

Under the terms of the written bonus agreement made in the spring of 1943, plaintiff on her showing of sales and profits in her departments was not entitled to any bonus for that year. Plaintiff herself so testified. She was asked, "You agree that on a strict construction of this contract as written you would not be entitled to

any bonus for the year 1943?" to which she answered, "That is correct."

Aside, therefore, from any other considerations under the written agreement between the parties, plaintiff was not entitled to receive a bonus at the time she quit. When plaintiff spoke to Troy on March 18, 1944, and it was agreed between them that under the written bonus agreement plaintiff would receive no bonus because of her failure to make her quota, he told her that he had worked out a new plan whereby, if department managers did not qualify for a bonus because of failure to make their quota, they would still receive something and thus soften their disappointment. Under this plan, if any employe came within a half of one percent of reaching her qualifying point, she would still get her bonus in full. If she missed by one-half of one percent up to one percent, she would receive two-thirds of the agreed bonus. If she missed from one percent up to two percent, she would receive one-third of the agreed bonus. If she missed over two percent, she would get nothing. When Troy disclosed to plaintiff this new plan, she told him, as she testified, that she had never heard of it before. They both therefore agreed that it was something new. Her services had already terminated. It was not part of the contract of employment. It was on the basis of this new plan that Troy told plaintiff that she would receive about $400, as she had missed her qualifying point by from one percent up to two percent. It was a pure bonus, not a contractual one. Troy refers to it as a penalty, but in view of the fact that under the circumstances plaintiff was going to receive something when under her contract she would get nothing, it cannot properly be designated or considered to be a penalty. Plaintiff testified that when Troy disclosed the new plan she reminded him of the conversation in August 1943. She testified:

"* * * I told him that was the first I had heard of our so-called penalty arrangement and reminded him of our oral agreement in August, I wouldn't have to make the gross margin requirement. He said, 'This is the way it is and this is what you are going to get.' I

said, 'That is not right, you know it is not right, Mr. Troy, and I won't ever agree to it'; that is the extent of our conversation.

\* \* \* \* \*

"Q. You said you would never agree to it?

"A. That is right."

She testified that he said nothing about the conversation she claimed they had in August. As stated, Troy expressly denied the claimed August conversation. He also testified that no reference was made to such conversation during their March 18, 1944, talk. In reference to the August 1943 conversation, he said that if such conversation had taken place a written memorandum would have been made, and there is no such memorandum or record.

Nothing was heard from plaintiff from March 18, 1944, when she left defendant's employ, until August 2, 1944, when she wrote Troy a letter, received by him on August 3, reading as follows:

"Dear Mr. Troy:

"I don't believe you have my current address; it is 1018 S. E. Fourth St., Minneapolis. Will you please send my bonus check to this address.

"Thanking you for taking care of this matter, I am

"Very truly yours,

"Jane Kavanagh."

There is no hint in this letter that there was any disagreement between plaintiff and Troy over the amount of the bonus. When she writes "send my bonus check," it is fair to assume that she meant a check in the amount Troy on March 18 said she would get under the new arrangement. Troy apparently assumed that such was the case, as on August 3, 1944, he replied to her letter, enclosing a check for $330.83 and a statement headed "BONUS SETTLEMENT STATEMENT." In this letter he stated:

"Dear Jane:

"Enclosed is a copy of your bonus statement together with your check for the net amount due after deducting for withholding tax and Social Security. As previously discussed with you when you

left us, the excessive markdowns and shortages unfortunately caused you to suffer a severe penalty for not obtaining necessary minimum gross margin plus discount objectives.

"I trust the enclosed settlement statement is completely self-explanatory. I was on the point of writing you when your note arrived this morning. You had guessed right—I did not have your address until the request from Dave Sanders last week brought it to light.

"Kindest personal regards.

"Yours very truly,

"P. J. Troy."

There is no hint in this letter that there had been any misunderstanding between plaintiff and Troy as to the bonus. The tone of both letters indicates a full understanding. In the Troy letter, reference is made to the conversation of March 18 relative to plaintiff's failure to make the bonus and the cause for such failure, but there is nothing to indicate any agreement as to a new bonus basis such as plaintiff claims was entered into in August 1943. Plaintiff received the letter, the bonus statement, and the check. She cashed the check. Nothing more was heard from her until seven months later, when her attorneys made a demand upon defendant for the amount sued for.

Many details have been omitted in the above statement of facts. The material facts, however, have been given. Upon this record, the jury returned a verdict for plaintiff for the full amount asked. The court granted defendant judgment notwithstanding the verdict.

Two questions are presented to this court:

(1) Did plaintiff prove or establish an oral modification of a written bonus agreement, substantially varying its terms, by clear and convincing evidence, as required by law?

(2) Was there a settlement and accord and satisfaction between plaintiff and defendant as a matter of law?

If the first question is answered in the negative, there is no occasion to consider the second question. The court in ordering judg-

ment notwithstanding the verdict did not indicate the ground upon which he based his order, whether it was on the one ground or the other.

As stated, plaintiff admits that under the written bonus agreement of 1943 she did not qualify for a bonus. She bases her suit for recovery on a claimed parol modification of the written agreement. This claimed modification is based on the following brief testimony, already quoted, given by plaintiff: "Mr. Troy then said, 'Forget about your gross margin requirements, your bonus will be based on the increase in volume,' and he pounded on the table and said, 'I want volume.' I said that was agreeable to me." On cross-examination, she repeated this testimony in substantially the same language. That is all of the testimony as to the modification of this written instrument. Troy specifically denied having had such a conversation with plaintiff. Assuming that a conversation took place in August 1943, as claimed by plaintiff, and that Troy stated that her bonus would be based on her increase in volume, there is nothing in her conversation to indicate what percentage on the increase would be given her. Would two percent still apply on her claimed new arrangement? All her claim is that her bonus would be based on the increase in volume and that nothing was said about percentage.

A parol modification of a written instrument must be made to appear by "clear and convincing evidence." That is the settled rule in this state. John A. Stees Co. v. Willis, 151 Minn. 192, 194, 186 N. W. 391, 392; Dwyer v. Illinois Oil Co. 190 Minn. 616, 252 N. W. 837; Slawson v. Northern States Power Co. 201 Minn. 313, 276 N. W. 275; Butterick Publishing Co. v. Johnson, 201 Minn. 345, 276 N. W. 277.

In the Butterick case the court said (201 Minn. 346, 276 N. W. 277):

"* * * the only question is the sufficiency of defendants' evidence. It sustains the verdict. True, 'a parol modification of a written contract must be proved by clear and convincing evidence.' Dwyer v. Illinois Oil Co. 190 Minn. 616, 619, 252 N. W. 837, 838. But defend-

ants' evidence was both unequivocal and uncontradicted. Intrinsically, it was neither improbable nor incredible. It convinced the jury and stands the test of 'clear and convincing' proof, which has to do with the character of the testimony itself and not the number of witnesses from whom it comes. Compare Benson v. Northland Transportation Co. 200 Minn. 445, 274 N. W. 532. In contrast is Slawson v. Northern States Power Co. 201 Minn. 313, 276 N. W. 275, where the evidence of modification was, as matter of law, held insufficient and not clear and convincing, because it was equivocal and had other frailties not present here."

In the Dwyer case the court said (190 Minn. 619, 252 N. W. 838):

"The trial court did not err in instructing the jury that a parol modification of a written contract must be proved by clear and convincing evidence. This court has held that to be justified in setting aside a written contract and holding it as abandoned or substituted by a subsequent parol contract at variance with its written terms the evidence must be clear and convincing. John A. Stees Co. v. Willis, 151 Minn. 192, 194, 186 N. W. 391; 2 Dunnell, Minn. Dig. (2 ed. & Supp.) § 1777. It was not error therefore for the trial court to refuse to instruct the jury as requested by defendant that merely a fair preponderance of the evidence was sufficient."

The burden of proof was upon plaintiff to prove the parol modification of the written instrument by more than a fair preponderance of the evidence. She was required to prove it by clear and convincing evidence. This, of course, did not mean beyond a reasonable doubt as in a criminal case.

In this case, there was a setting where a conversation such as plaintiff claims could reasonably have taken place. The remodeling and surplus of stock caused markdowns which affected plaintiff's bonus possibilities.

In the written bonus agreement is found this provision:

"It is important that The Golden Rule reserve the right to direct the taking of any markdowns it deems fit, or the making of any other expenditure, or the adjustment of any selling area, even though such

action would seriously affect the sales volume of specific departments."

Thus, under the terms of the written agreement itself, plaintiff was not in a position to complain about markdowns or the adjustment of any selling area.

Plaintiff claims that a conversation with Troy took place in August 1943 which in effect created a modification of the written agreement. Troy specifically denied that any such conversation took place. He testified that if any such material change in the contract had been made a memorandum or record would have been made. That is a reasonable, proper, and common procedure in such a case. No memorandum or record exists. Plaintiff testified that when she quit and Troy told her of the new bonus arrangement she reminded him of their conversation of the previous August. He specifically denied any such reference. As to the other details of that conversation, they are in accord. There is nothing in Troy's testimony as a whole that does not give the impression of veracity. After plaintiff left defendant's employ, nothing was heard from her until the receipt by Troy of her letter of August 2, 1944, four and a half months later, which letter has been quoted in full. The tone of the letter and its contents certainly give no support to plaintiff's claimed modification. She had testified that in the March 18 conversation she had told Troy that she never would agree to take the bonus proposed under the new arrangement, giving the impression that there was a very serious disagreement between them. Her letter winds up, "Thanking you for taking care of this matter, I am Very truly yours, Jane Kavanagh." As stated, there is nothing in this written instrument that tends to support plaintiff's contention for oral modification. Troy replied the day plaintiff's letter was received, enclosing a check and a so-called bonus settlement statement. This letter has been quoted in full. There is nothing in this communication that gives any support, inferentially or otherwise, to plaintiff's claim that there had been any conversation relative to a modification or any disagreement as to plaintiff's bonus. Nothing was then heard from

plaintiff for seven months, when, through her attorneys, she made the demand sued on.

Since, in our opinion, plaintiff has failed to prove to the required degree a modification of the written bonus agreement, we need not consider the question of accord and satisfaction.

Judgment affirmed.